J. S12040/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TOD GORDON AND CARVER W. REED & CO., INC., | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LEE M. HERMAN, ESQUIRE, | : | |
| | : | |
| Appellant | : | No. 1961 EDA 2014 |

Appeal from the Judgment Entered May 19, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division No(s).: 00871 September Term, 2012

BEFORE: BOWES, SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:               **FILED JUNE 09, 2015**

Appellant, Lee M. Herman, Esquire, appeals from the judgment[1]

entered in the Philadelphia County Court of Common Pleas assessing

damages in favor of Appellees, Tod Gordon and Carver W. Reed & Co., Inc.,

in the amount of $245,097.00 upon the first count of the complaint and

$10,107.00 upon the second count of the complaint. Appellant contends the

court erred by (1) entering a default judgment on the issue of liability as a

discovery sanction and (2) awarding damages in a legal malpractice case

---

[*] Former Justice specially assigned to the Superior Court.

[1] We note Appellant purported to appeal from three orders entered on May 19, 2014. An appeal properly lies from the entry of judgment. The trial court entered judgment on May 19, 2014. Thus, this Court's appellate jurisdiction was perfected. ***See generally Johnston the Florist, Inc. v. TEDCO Const. Corp.***, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*). We have amended the caption accordingly.

where there was no evidence that the attorney's conduct was the proximate cause of harm. We affirm.

We adopt the procedural history and facts set forth by the trial court. *See* Trial Ct. Findings of Fact and Conclusions of Law, 4/21/14, at 1-3. On April 21, 2014, the court entered an order assessing damages in favor of Appellees in the amount of $245,097.00. Order, 4/21/14. Appellees filed a post-trial motion on April 25, 2014. The court granted the motion on May 19, 2014, and vacated the conclusions of law in paragraphs thirty-seven through thirty-nine of the court's findings of fact and conclusions of law. The order provided that judgment by default had been entered upon the second count of Appellees' complaint seeking damages in the amount of $10,107.50 for attorney's fees paid to Appellant plus statutory interest. Order, 5/19/14.

Meanwhile, on May 5, 2014, Appellant also filed a post-trial motion. On May 19, 2014, the motion for post-trial relief was denied. Amended Order, 5/19/14. In a second amended order, judgment was entered assessing damages in favor of Appellees in the amount of $245,097.00 and attorney fees paid to Appellant in the amount of $10,107.50. Amended Order, 5/19/14.[2] This timely appeal followed. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal and the trial court filed a Pa.R.A.P. 1925(a) memorandum opinion incorporating

---

[2] The trial court entered one order and two separate amended orders on May 19, 2014.

its April 21st findings of facts and conclusions of law as amended by its May 19, 2014 order granting Appellees' post-trial motion.

Appellant raises the following issues for our consideration:

> 1. Did the trial court commit reversible error where it entered a default judgment on the issue of liability as a discovery sanction even though there was no finding that the opposing party had been prejudiced or that Appellant's disobedience was willful?
>
> 2. Did the trial court commit reversible error by awarding damages in a legal malpractice case where there was no evidence that the attorney's conduct was the proximate cause of harm in a business transaction where [Appellees]-buyers could not prove that sellers would have agreed to a provision which would have provided [Appellees]-buyers with a tax advantage and which would have been disadvantageous to sellers?

Appellant's Brief at 4.

First, Appellant argues the trial court erred in not considering the four factors enunciated by the Pennsylvania Supreme Court in *City of Phila. v. FOP Lodge 5 (Breary)*, 985 A.2d 1259 (Pa. 2009), before entering a default judgment as a sanction for violation of the discovery orders of November 27, 2012, and January 9, 2013. Appellant avers

> the mere failure of the lower court to even consider the four factors as mandated in *Breary* before it entered a default judgment, **alone**, mandates a reversal by this Court. Moreover, an examination of the uncontested facts in the present case establishes that the two most important factors which should have been considered by the lower court,—**prejudice** and **willfulness**—were not even considered. As such, the most severe sanction of dismissal which was imposed against [Appellant], should not have even been considered.

Appellant's Brief at 17 (emphases supplied).

Our review is guided by the following principles:

> A petition to open a default judgment is addressed to the equitable powers of the court and the trial court has discretion to grant or deny such a petition. The party seeking to open the default judgment must establish three elements: (1) the petition to open or strike was promptly filed; (2) the default can be reasonably explained or excused; and (3) there is a meritorious defense to the underlying claim. The court's refusal to open a default judgment will not be reversed on appeal unless the trial court abused its discretion or committed an error of law. An abuse of discretion is not merely an error in judgment; rather it occurs when the law is overridden or misapplied, or when the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. Moreover, this Court must determine whether there are equitable considerations [that] weigh in favor of opening the default judgment and allowing the defendant to defend the case on the merits. Where the equities warrant opening a default judgment, this Court will not hesitate to find an abuse of discretion.

**Stabley v. Great Atl. & Pacific Tea Co.**, 89 A.3d 715, 719 (Pa. Super. 2014) (citation omitted).

We consider whether a judgment by default should be entered where Appellant failed to file an answer to the complaint containing a notice to defend. Appellant was served with the complaint on September 27, 2012. On November 1, 2012, a default judgment was entered for failure to file an answer to the complaint. Order, 11/1/12. Appellant filed a petition to open the default judgment, which the court granted on December 11, 2012. The court ordered Appellant to file an answer to the complaint within fourteen

days of the date of the order. Appellant did not file an answer to the complaint and the court entered a default judgment on February 7, 2013.

In **Wells Fargo Bank, N.A. v. Vanmeter**, 67 A.3d 14 (Pa. Super.), *appeal denied*, 76 A.3d 540 (Pa. 2013), the defendant was served with a complaint with a notice to defend. **Id.** at 19. This Court opined:

> [The a]ppellants do not deny that they were served with Bank's complaint seeking to foreclose on [their] mortgage, and which contained a notice to defend. The notice to defend admonished [the a]ppellants that "a judgment may be entered against you by the Court without further notice" and that "[y]ou may lose money or property or other rights important to you." Notwithstanding this warning, [the a]ppellants never answered the complaint, and their petition did not explain their lack of response. [The a]ppellants expect us to disregard that default judgments are valid where a party, once served, fails to answer or defend a suit filed against them. We cannot do so. **See Romeo v. Looks**, [ ] 535 A.2d 1101 ([Pa. Super.] 1987) (affirming trial court's denial to reopen judgment where complaint validly served).

**Id.** (some citations omitted).

Similarly, in the case at bar, Appellant does not deny he was served with a complaint containing the following notice to defend:

> You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. **You are warned that if you fail to do so the case may proceed without you** and a judgment notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. **You may lose money or property or other rights important to you**.

Compl., 9/10/12 (emphases added).

Appellant does not contest the trial court's finding that no answer was filed to the complaint. The petition to open the default judgment did not explain the lack of response to the complaint. The trial court denied the petition to open the default judgment and we discern no abuse of discretion or error of law.[3] *See Stabley*, 89 A.3d at 719; *Wells Fargo Bank*, 67 A.3d at 19.

Next, Appellant avers the trial court erred in awarding damages in this legal malpractice action where Appellees did not prove damages that were actually suffered by them as a result of Appellant's presumed negligence. Appellant concedes "liability had been determined by virtue of the default judgment . . . ." Appellant's Brief at 21. Appellant claims the evidence adduced at the assessment of damages hearing was "entirely speculative." *Id.* at 22. He states:

> The evidence adduced at the Assessment of Damages hearing . . . included uncontroverted testimony that Mr. Gordon's sister refused to sign any agreement which contained the desired allocation provision, and, Mr. Gordon's failure to testify that he would have refused to sign any agreement without the provision. Accordingly, the trial court's finding that [Appellees] had been harmed by the failure of [Appellant to] include the desired allocation provision or to advise that it had been removed was not supported by **any** competent evidence.

---

[3] We note that we can affirm a trial court for any reason. *The Brickman Group, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 928 (Pa. Super. 2004).

*Id.* at 22 (emphasis added).

On this issue, our standard of review is as follows:

> The duty of assessing damages is within the province of the [fact-finder] and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. If the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we might have awarded different damages.

*Newman Dev. Grp of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 659-60 (Pa. Super. 2014) (citation omitted).

Instantly, the trial court found Appellees "presented credible evidence that [Appellants'] failure to perform as instructed resulted in their inability to claim interest payment deductions on tax forms. [Appellants] presented credible evidence of the amount of the loss of the interest payment deduction to [them]." Trial Ct. Op. at 5 (unpaginated). We agree no relief is due.

Richard Morgenstern, a certified public accountant, testified as an expert witness for Appellees at the assessment of damages hearing. N.T., 5/16/13, at 53-54. He is the accountant for Appellees and has "certification as a Certified Valuation Analysis [sic] which is for business appraisals of privately owned companies." *Id.* at 53-54, 56. He was actively involved in advising Appellee Gordon during the time the agreement was being

negotiated. *Id.* at 59. He did not see any of the drafts of the proposed agreement. *Id.* at 61. He was with Appellee Gordon when Appellant called to discuss the stock purchase agreement on March 16, 2012. *Id.* He testified: "Towards the end of the conversation I said to [Appellee] Gordon please remind him to make sure there is an allocation between interest expense and the principal for the purchase of the preferred stock written into the agreement because we get a tax deduction for interest expense." *Id.* He did not see the final draft of the agreement before Appellee Gordon signed it. *Id.*

On May 29th, Morgenstern asked for the documents and Appellant e-mailed the unsigned documents to him, although Appellee Gordon had already signed them. *Id.* at 63. He asked Appellant where in the agreement the interest expense was shown. *Id.* Appellant responded that "he would like to have his own accountant tax specialist consult with him to see if there was a way we could get a tax deduction for the interest expense despite the fact that there was nothing written in the agreement regarding the interest expense." *Id.* at 64. Appellant asked Morgenstern to prepare a written memo to explain what he considered to be things that were wrong with the executed agreement. *Id.* He complied to no avail. *Id.*

Morgenstein testified Appellant "suggested that he would prepare an addendum to the agreement that would be just for [Appellee Gordon's] copy only that would say that there was an interest expense of a certain amount

and we could attach that to our copy of the agreement with the implication that if we were ever audited we can just provide that agreement to the governmental authorities and show that we had interest expense." *Id.* at 64-65. Morgenstern did not agree, explaining that it would be unethical. *Id.* at 65.

The instant transaction was reported in the 2012 tax returns for the corporation. *Id.* at 65-66. There was no tax deduction taken because "[t]he purchase of stock by a corporation is a none [sic] tax deductible expenditure." *Id.* at 66. Because Appellee Gordon did not have the funds to purchase the stock, *viz.*, a million dollars, the corporation purchased the stock. *Id.* at 67-68. Appellee Gordon assigned his rights and obligations under the agreement to the corporation. *Id.* at 68.

Morgenstern explained the computation of damages based upon an agreement which would have had the "interest expense separately allocated as part of the total amounts paid" as follows: *Id.* at 69.

> [Counsel for Appellees]: How did you reach the allocation amounts? What was that based on?
>
> A: The 1997 shareholder's agreement of Carver W. Reed actually specified what the purchase price of these specific preferred stock shares would be.
>
> In that agreement it specified that the purchase of the Class A and the Class B preferred stock shares that were being sold by the estate of Charles Gordon was $626,000.00. It was very clear and there was no margin of error or any doubt about it. It was a stated dollar amount.

So, what I did is I took the total purchase price of one million dollars that was actually paid and I subtracted the $626,000.00 element that is attribute[d] to the purchase price of the preferred stock shares alone being that the difference is $374,000.00 which is what represents interest expense.

Q: Was this your intent in communicating your request for **allocation of principal and interest** through [Appellee] Gordon to [Appellant].

A: Exactly.

In fact it was really known by all of the parties that there was an element of interest because in December of 2011, [ ] counsel for the estate [ ] had prepared a computation of the interest expense element of what the total price would be and had apparently given that to [Appellant] who sent the same numbers to [Appellee] Gordon who sent the same numbers to me to check the mathematics which I did and I responded on December 22nd of 2011 to [Appellee] Gordon about the computation and allocation of interest.

So, this issue of allocation of interest had been known and computed by all parties for months before the final agreement was signed.

*    *    *

Q: What would have been the proper tax treatment in your opinion?

A: The proper treatment was, referring to the 1997 shareholders agreement, that agreement had said that interest would be paid.  The payments would be paid to buy the stock plus interest over a four year period.

So, I felt that the proper way to handle this from a tax deduction point of view would be considered that the $374,000.00 of total interest expense that would have been paid as part of the one million dollars was actually what we call for accounting purposes and tax purposes free paid interest expense.

And it would be allocated evenly over a four year period. So, we would get one fourth of the total $374,000.00 per tax year or $93,500.00 per year as a **tax deduction**.

\* \* \*

Q: Now, you also mention the difference between a C and an S Corporation. How is that involved here?

A: A C Corporation is a corporation that pays its own income taxes. It is under the Internal Revenue Code[.] Subchapter C deals with—

\* \* \*

Under the Internal Revenue Code Subchapter C corporations have their own income tax rates. It is a special tax rate table.

Q: And an S Corporation?

A: An S Corporation is a different type of corporation. It is a small business corporation that if the corporation qualifies the shareholders of the corporation can file an election with the Internal Revenue Service to treat the corporation as a small business corporation.

In such case [sic] for Federal purposes the corporation itself does not pay any income taxes rather it reports each stockholders percentage ownership share of income to the stockholder and then the stockholder reports that income as part of their personal income tax returns and pays personal income tax on the account.

Q: So, in this case in 2012 and thereafter any profits or losses of the corporation would be either paid or suffered by Appellee individually; is that correct?

A: Yes.

Q: Now, based on the allocation over the four year period of the tax deduction loss what was the amount, the total

that you came up with in terms of what was lost by not having the tax deduction?

A: Well, there's actually two parts to this. The first part is over the four year period for the $374,000.00, the total amount of lost tax deductions or lost tax savings so to speak, not deductions. Deduction would be the full amount. **The amount of taxes that could not be reduced were $159,212.00**.

Q: Now, there is a second portion in your report relating to the deferred payments to Jeanette Gordon, is that correct?

A: Yes, that is correct.

Q: Explain that to us.

A: Under the second section in my computation the shareholders agreement calls for additional payments to be made by the buyer of the stock to Jeannette Gordon that if she is still living on January 1st of 2014, 1016, January 1st of 2017, and also 2018 there are specific dollar amounts of payments that are required to be paid on those dates.

And because of the fact that the amount that has been previously paid out of the one million already encompassed the entire amount that's attributable to the preferred stock shares.

These additional payments can't be classified in any way other than being interest expense. Therefore, if these contingent payments do occur and Jeanette Gordon is still alive these would be additional lost tax savings.

Q: And what is the total of those **lost tax savings**?

A: That amount is **$85,885.00.**

Q: And both of these amounts include both Federal, State and City taxes, is that correct?

A: Yes.

Q: And the total of the two sections, what is **the total loss**?

A: **$245,097.00**.

Q: The opinions you've rendered here today and the testimony you [sic] given are they stated within a reasonable degree of professional certainty?

A: Yes.

*Id.* at 70-76 (emphases added).

Based upon the evidence adduced at trial, the trial court found Appellees damages were $245,097.00. Trial Ct. Op. at 5. We discern no abuse of discretion. ***See Newman Dev. Group of Pottstown, LLC***, 98 A.3d at 659-50

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/9/2015

- 13 -

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
PHILADELPHIA COUNTY
COURT OF COMMON PLEAS

| | | |
|---|---|---|
| TOD GORDON and CARVER W. REED<br>& CO., INC.<br>    Plaintiffs | : | |
| | : | |
| | : | |
| | : | SEPTEMBER TERM, 2012 |
| V | : | No. 0871 |
| | : | |
| LEE M. HERMAN, ESQUIRE<br>    Defendant | : | |

## FINDINGS OF FACT and CONCLUSIONS OF LAW

AND NOW, this 21st day of April, 2014, after consideration of the evidence presented

and subsequent due deliberations, the Court hereby enters the following Order, Findings of Fact

and Conclusions of Law.

## I.    PROCEDURAL HISTORY

1.  Plaintiffs, Tod Gordon ("Gordon") and Carver W. Reed & Co., Inc. ("Reed"), commenced this legal malpractice action against defendant Lee M. Herman, Esquire ("Defendant") by complaint on September 10, 2012.

2.  Personal service was made on the defendant September 27, 2012.

3.  On November 1, 2012, a default judgment was entered against the defendant.

4.  On November 9, 2012, the defendant filed a petition to open judgment.

5.  Pending review of the petition, on November 27, 2012, the parties entered into an agreement whereby defendant agreed to submit full and complete answers to discovery requests "within twenty (20) days."

6.  On December 11, 2012, the Honorable Sandra Mazer-Moss granted defendant's petition to open judgment.

7.  The court ordered the defendant to file his answer within fourteen (14) days of the date of the order.

Gordon Etal Vs Herman-FACTS



8. No answer was filed.

9. On December 13, 2012, plaintiff requested a discovery hearing before this court.

10. On January 9, 2013, plaintiff appeared in discovery court; the defendant did not.

11. Plaintiff alleged that the defendant failed to produce discovery as agreed to and memorialized by the parties in the Order dated November 27, 2013.

12. An Order granting sanction was issued and defendant was directed to produce discovery on or before January 20, 2013.

13. On January 22, 2013, plaintiff requested a discovery hearing.

14. On February 7, 2013, plaintiff appeared in discovery court; defendant did not.

15. Defendant failed to produce discovery as directed by the court.

16. On February 7, 2013, the court issued a judgment by default as to issues of liability.

17. An assessment of damages hearing was scheduled for May 16, 2013.

## II.   FINDINGS OF FACTS

18. Gordon is the president of Reed. Assessment of Damages, Transcript, p. 21, ll.5-8 (05/16/2013).

19. Plaintiffs retained the defendant to negotiate a shareholders' agreement with the estate of Gordon's father, specifically to secure outstanding preferred stock and structure a deal to obtain certain tax benefits as provided in the prior 1997 shareholders' agreement. Assessment of Damages, Transcript, p. 22, ll.6-11; pp. 71-72 (05/16/2013).

20. Pursuant to instructions from plaintiffs and their accountant, the defendant was directed to draft the shareholders agreement such that the principal and interest were specifically delineated in the agreement. Assessment of Damages, Transcript, p. 24, ll.1-11 (05/16/2013).

21. If the purchase price were so separated – principal ($626,000) and interest payments over the 4-year period ($374,000) – plaintiffs would be eligible to deduct the interest payments which would result in a tax savings in the amount of $245,097. Assessment of Damages, Transcript, pp. 41-42; p. 105, ll. 19-23; pp. 69-76 (05/16/2013).

22. In the alternative, if the agreement only provided a purchase price, plaintiffs would not realize the tax savings. Assessment of Damages, Transcript, pp. 63-64, 77-78; 93, l. 21 (05/16/2013).

23. The agreement negotiated by the defendant on behalf of plaintiffs did not contain the allocation provision contrary to the direction of the plaintiffs. Assessment of Damages, Transcript, p. 107, ll. 21-25 (05/16/2013).

24. As a consequence, plaintiffs were unable to deduct interest payments on relevant tax forms. Assessment of Damages, Transcript, pp. 77-78 (05/16/2013).

25. Gordon paid the defendant $10,107.50 for services rendered.

26. Plaintiffs' complaint contained no allegation of a conflict of interest and breach of fiduciary duty related thereto.

27. Plaintiffs' complaint contained no allegation of a breach of loyalty.

28. Plaintiffs presented no evidence of a conflict of interest and/or a breach of fiduciary duty related thereto.

29. Plaintiffs presented no evidence of a breach of loyalty.

## III. CONCLUSIONS OF LAW

30. In a legal malpractice case such as this, liability is not at issue, the burden to establish damages is that of the plaintiffs. *See Mariscotti v. Tinari*, 335 Pa. Super. 599, 485 A.2d 56, 57 (1984) (an essential element of a claim of legal malpractice is proof of actual loss); see also *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030 (1998) (an essential element of a claim of legal malpractice "proof of actual loss rather than breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm").

31. The plaintiffs must present evidence sufficient for which damages may be determined on "some rational basis and other than by pure speculation or conjecture." *Curran v. Stradley, Ronon, Stevens & Young*, 361 Pa. Super. 17, 25, 521 A.2d 451, 455 (1987).

32. Here, plaintiffs presented credible evidence of defendant's failure to draft an agreement listing payment of $374,000 as interest payment.

33. Plaintiffs presented credible evidence that the defendant drafted a document that listed the $374,000 as principal, contrary to plaintiffs' instructions.

34. Plaintiffs presented credible evidence that defendant's failure to perform as instructed resulted in their inability to claim interest payment deductions on tax forms.

35. Plaintiff presented credible evidence of the amount the loss of the interest payment deduction to the plaintiffs.

36. Accordingly, damages in the amount of $245,097.00 are hereby awarded.

37. Plaintiffs cited no legal authority providing that disgorgement of fees is appropriate in this case. See *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277 (1992) ("Courts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests").

38. Plaintiffs reference *Bailey v. Tucker*, 621 A.2d 108 (Pa. 1993) wherein the Court limited legal malpractice damages in a criminal case to fees paid plus statutory interest; consequential damages, though permissible in civil actions, were expressly prohibited in criminal.

39. The court declines to award disgorgement of fees paid to the defendant.

BY THE COURT:

ALLEN, J.